# Prepayment Authority Under the Rural Electrification Act of 1936

Section 306A of the Rural Electrification Act of 1936, as amended, which authorizes borrowers of Federal Financing Banking loans to prepay those loans if private capital is used to replace the loan, does not preclude prepayment with funds obtained by means other than refinanced loans secured by existing Rural Electrification Act loan guarantees. In particular, prepayment may be made from internally generated funds.

Section 306A does not authorize the issuance of regulations creating a priority in favor of borrowers who agree to prepay such loans with internally generated funds.

May 2, 1989

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

This memorandum responds to your request of February 8, 1989, for the opinion of this Office concerning the proper construction of section 306A of the Rural Electrification Act of 1936 (the "RE Act"), as amended, 7 U.S.C. § 936a. This section authorizes borrowers of Federal Financing Bank ("FFB")[1] loans guaranteed by the Rural Electrification Administration ("REA") to prepay the loans if, inter alia, "private capital, with the existing [REA] loan guarantee, is used to replace the loan." 7 U.S.C. § 936a(a)(2). You have asked whether section 306A permits a borrower to prepay an FFB loan only if the borrower uses the proceeds of an REA-guaranteed private refinancing loan to do so, or whether the statute also authorizes prepayment with private capital generated by means other than an REA-guaranteed refinancing loan, such as with internally generated funds. The General Counsels of the Department of Agriculture and the Office of Management and Budget ("OMB") have joined in your request for an opinion on this issue. *See* Letter for Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, from Christopher Hicks, General Counsel, Department of Agriculture, (Feb. 9, 1989).

In addition, at the oral request of your Office and the Offices of the General Counsels of the Department of Agriculture and OMB, we have examined the legality of section 1786.6 of REA's draft regulations imple-

---

[1] The FFB is an instrumentality and wholly-owned corporation of the United States  12 U.S C. §§ 2281-2296

menting the most recent amendments to section 306A (the "Draft 1989 REA Regulations"), which would, with respect to $300 million of the $500 million of prepayment authority, create a priority in favor of borrowers who agree to prepay their FFB loans with internally generated funds, rather than use privately refinanced loans backed by existing REA guarantees.[2]

For the reasons set forth below, we have concluded that section 306A does not preclude prepayment with funds obtained by means other than refinanced loans secured by existing REA loan guarantees. We have also determined that the priority scheme proposed in the Draft 1989 REA Regulations would be inconsistent with Congress' intent to provide for FFB loan prepayment through private capital, irrespective of the manner in which the capital is generated.

## I. BACKGROUND

Section 306 of the RE Act, 7 U.S.C. § 936, authorizes the Administrator of REA to guarantee loans made by any legally organized lending agency. FFB is such an agency. 12 U.S.C. §§ 2281-2296. Under FFB's program of lending to rural electric and telephone cooperatives, each borrower agrees in its promissory note that its FFB loan or any advance thereunder may be prepaid by paying, in most cases, the "market value" of such loan or advance. *See* Letter for Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, from Mark Sullivan III, at 1 n.5 (Feb. 8, 1989). The market value requirement is intended to preserve for the FFB the yield on each loan it makes.

Beginning in July 1986, Congress enacted a series of statutory provisions permitting some borrowers of FFB loans guaranteed by REA to prepay such loans by paying the "par value" of the loan (its outstanding principal balance plus accrued interest, if any), rather than the higher "market value". On July 2, 1986, Congress enacted the first such FFB loan prepayment measure as part of the Urgent Supplemental Appropriations Act, 1986, Pub. L. No. 99-349, 100 Stat. 710, 713-14 (the "1986 Supplemental Appropriations Act"). An undesignated paragraph in that Act provided that an FFB borrower may prepay its loan by paying the outstanding principal balance due "using private capital with the existing loan guarantee." 100 Stat. at 713. To qualify for par prepayment under this provision, a borrower was required to certify that its prepayment would result in "substantial savings to its customers" or "lessen the threat of bankruptcy of the borrower." *Id.* The Secretary of the Treasury was authorized to disapprove any prepayments which, in his opinion, would adversely affect the operation of the FFB. *Id.* at 713-14.

---

[2] The Agriculture Department has predicted that, as a result of this priority, non-distressed borrowers seeking to prepay using REA-guaranteed private refinancings would be precluded from prepaying any of their FFB loans. Draft 1989 REA Regulations at 14-15.

117

On October 21, 1986, Congress continued this prepayment program by enacting the Omnibus Budget Reconciliation Act of 1986 ("OBRA 1986"), Pub. L. No. 99-509, 100 Stat. 1874. Section 1011 of this Act substantially adopted the earlier prepayment provision, and with slight modification made it a permanent part of the RE Act, as section 306A. 100 Stat. at 1875-76.

Subsection (a)(2) of new section 306A provides, in pertinent part, that a borrower may prepay its FFB loan "if ... private capital, with the existing loan guarantee, is used to replace the loan." The borrower must certify that any savings resulting from prepayment will be "passed on to its customers or used to improve the financial strength of the borrower in cases of financial hardship." 7 U.S.C. § 936a(a)(3). Subsection (c) of the new section 306A limited the Treasury Secretary's authority to disapprove prepayments to amounts in excess of $2.0175 billion in aggregate principal prepayments in fiscal year 1987.[3]

On December 22, 1987, Congress adopted the Fiscal Year 1988 Continuing Resolution, Pub. L. No. 100-202, 101 Stat. 1329, 1329-356 to 357 (1987), which included the "Rural Development, Agriculture, and Related Agencies Appropriations Act, 1988" (the "FY 1988 Appropriations Act"). Section 633 of this Act authorized further prepayments pursuant to section 306A of the RE Act and further curtailed the Treasury Secretary's authority to disapprove prepayments by providing that such authority could only be exercised after an aggregate of $2.5 billion in FFB loans had been prepaid. This enactment made no amendment to the language of subsection (a) of section 306A.

Later the same day, Congress enacted the Omnibus Budget Reconciliation Act of 1987 ("OBRA 1987"), Pub. L. No. 100-203, 101 Stat. 1330, 1330-20. Section 1401 of OBRA 1987 contained essentially the same authorization for additional FFB prepayments contained in the FY 1988 Appropriations Act and, like the 1988 Act, made no amendments to section 306A(a) of the RE Act. Whereas the FY 1988 Appropriation Act had, as permanent legislation, excepted from the Treasury Secretary's disapproval authority prepayment amounts up to an aggregate of $2.5 billion, OBRA 1987 provided that, for fiscal year 1988, prepayments in excess of a $2.0 billion aggregate were subject to disapproval by the Secretary.[4]

---

[3] It has been represented to us by the interested agencies that this figure represented Congress' estimate of the amount of high-interest FFB loans held by financially distressed borrowers. Similarly, in subsection (d)(2) of OBRA 1986 Congress required REA to establish "eligibility criteria to ensure that any loan prepayment activity    be directed to those cooperative borrowers in greatest need of the benefits associated with prepayment." 7 U.S.C. § 936a(d)(2) In its next enactment, an undesignated paragraph of the Supplemental Appropriations Act, 1987, Pub. L. No. 100-71, 101 Stat. 391, 429, Congress permanently suspended the operation of section 306A(d)

[4] Sections 1401(b)(1) & (2) also established new priorities for prepayment: first, certain borrowers already determined to be eligible prior to OBRA 1987's enactment, followed by borrowers in the order in which they were prepared to disburse funds to the FFB to complete prepayment. 101 Stat at 1330-20 This priority provision expired at the end of fiscal year 1988.

Since the FY 1988 Appropriations Act permanently authorized $2.5 billion of section 306A prepayments not subject to the Treasury Department's approval, and OBRA 1987, in effect, limited the amount of par prepayments authorized in fiscal year 1988 to $2.0 billion, there remained authorization to make additional prepayments not subject to the Treasury Secretary's approval in an amount not in excess of $500 million at any time after the end of fiscal year 1988.

On October 1, 1988, Congress enacted the Fiscal Year 1989 Rural Development, Agriculture, and Related Agencies Appropriations Act (the "FY 1989 Agriculture Appropriations Act"), Pub. L. No. 100-460, 102 Stat. 2229 (1988). Section 637 of that Act, 102 Stat. at 2264, required that REA allocate $150 million of the remaining $500 million prepayment authority under section 306A to borrowers in REA's telephone loan program and $350 million to borrowers in REA's electric loan program. REA circulated the Draft 1989 REA Regulations to implement the statutory allocation between the REA telephone loan program and the REA electric loan program. Subsection (d) of section 1786.4 of the Draft 1989 REA Regulations would authorize borrowers to use "Internally Generated Funds without a guarantee" to prepay FFB loans. Section 1786.3(a) of the regulations would define "Internally Generated Funds" as "money belonging to the borrower other than (1) proceeds of loans made or guaranteed under the RE Act or (2) funds on deposit in the cash construction trustee account."

Section 1786.6(a) of the regulations would establish a priority for processing applications for par prepayments. This subsection provides that the Administrator of REA will give a preference in processing prepayment applications to those applications from borrowers agreeing to use Internally Generated Funds to prepay their FFB loans. This preference will extend over all other prepayment applications except those applications submitted by "Financially Distressed Borrowers." Section 1786.6(a)(1).[5] REA states in the commentary appended to its regulations that it

> believes that the amount of prepayment applications received from financially distressed electric borrowers and from other electric and telephone borrowers wishing to utilize Internally Generated Funds in connection with a prepayment, [sic] will exceed the $500 million available for prepayment without the approval of the Secretary of the Treasury.

[5] Section 1786 3(a) of the Draft 1989 REA Regulations defines "Financially Distressed Borrowers" as follows

"Financially Distressed Borrower" means an REA-financed electric system determined by the Administrator to be either (i) in default or near default on interest or principal payments due on loans made or guaranteed under the RE Act, and which is making a good faith effort to increase rates and reduce costs to avoid default, or (ii) participating in a work out or debt restructuring plan with REA, either as the borrower being restructured or as a borrower providing assistance as part of the work out or restructuring

Draft 1989 REA Regulations at 14-15. Because the Treasury Secretary has apparently determined to disapprove any applications exceeding $500 million in aggregate prepayments, the Draft 1989 REA Regulations could effectively preclude some borrowers from prepaying their FFB loans with the proceeds of a new loan from private sources backed by an existing REA guarantee.

## II. USE OF INTERNALLY GENERATED FUNDS

By its terms, section 306A(a)(2) authorizes an FFB borrower to prepay its loan "if ... private capital, with the existing loan guarantee, is used to replace the loan." 7 U.S.C. § 936a(2). The dispute between the Departments of Agriculture and the Treasury centers on the meaning of the phrase "with the existing loan guarantee." The Treasury Department reads this phrase as a restriction on the kind of private capital that an FFB borrower can use to prepay its loan. It argues that the phrase requires that a borrower seeking to prepay an FFB loan replace the FFB loan with a privately refinanced loan secured by the borrower's REA guarantee. In other words, the Treasury Department maintains that under section 306A an FFB borrower is authorized to use only REA-guaranteed refinanced loan proceeds to prepay its FFB loan and is prohibited from using, in whole or in part, any other form of private capital.

The Department of Agriculture argues that Congress intended a borrower to be able to prepay its FFB loan with any form of private capital, however generated or secured. The Agriculture Department contends that the clause "with the existing loan guarantee" was included in section 306A merely to ensure that a borrower would be permitted to use its existing REA guarantee *if and to the extent* needed to secure private refinancing. Under this construction, an FFB borrower is not compelled to rely exclusively, or even at all, on refinanced loans to prepay its FFB loan, but may prepay with any combination of loan proceeds and internally generated funds, and whether or not the capital is guaranteed by REA.

We believe that neither of the proffered interpretations is dictated by the statutory language. This is not a case where the "plain meaning" of the statute compels acceptance of one construction over the other. Given the ambiguity in the statutory language itself, we must resort to other indicia of Congress' intent — here, principally, the legislative history, the circumstances surrounding enactment of the statute, and the statute's overall purpose and internal logic.

Congress enacted section 306A during a period of sharply declining interest rates. *See, e.g.*, 132 Cong. Rec. 12,678 (1986) (statement of Sen. Burdick). It was concerned that the high rates that had been charged on FFB loans in prior, inflationary years were contributing to a weakening of the rural economy. *See, e.g., id.* at 12,680 (statement of Sen. Johnston). Its obvious purpose was to provide through section 306A relief to rural coop-

eratives and their customers by permitting such cooperatives to prepay their high-interest FFB loans without penalty. The right to prepay, however, was explicitly conditioned on the use of "private capital," not additional public funds. *See, e.g., id.; id.* at 12,682 (statement of Sen. Andrews).

As the legislative history shows, at the time of enactment of section 306A, Congress assumed that most, if not all, borrowers would have to depend, in whole or at least in part, on private refinancing loans to prepay their FFB loans.[6] This assumption is also evident in the statutory requirement that a borrower certify that its prepayment would "result in substantial savings to its customers or *lessen the threat of bankruptcy to the borrower*." 1986 Supplemental Appropriation Act, 100 Stat. at 713 (emphasis added). Congress also recognized that such needy borrowers would have difficulty obtaining advantageous private loans unless they could use as security their existing REA guarantees. Indeed, without the REA guarantees, needy borrowers would be effectively precluded from availing themselves of the section 306A prepayment opportunity.[7]

Congress' overall design was thus to give FFB borrowers the right to prepay their FFB loans with private capital, but to make that right meaningful by permitting them to use their existing REA guarantees to raise private funds. This broad relief was animated by two explicit congressional objectives — to strengthen the financial condition of the cooperatives themselves, and to pass cost savings through to the cooperative's customers. *See supra* p. 117 (discussing certification requirements in 1986 Supplemental Appropriations Act).

Given these congressional objectives, we think that the better interpretation is that Congress simply meant to ensure in section 306A that borrowers could use their existing REA guarantees *if they wished, and to the extent necessary*, to secure private refinancing. Congress meant to *permit* borrowers to use their existing REA guarantees to the extent needed to secure private capital; it did not *command* that borrowers pre-

---

[6] *See, e g.,* 132 Cong Rec. 15,838 (1986) (statement of Sen. Cochran), *id* at 12,683 (statement of Sen. Domenici); *id.* at 12,678 (statement of Sen Burdick) Similar references appear in discussions of several of the later enactments *See, e g ,* H.R. Rep. No. 195, 100th Cong., lst Sess 79 (1987) (discussing the 1987 Supplemental Appropriations Act); H R Rep No 391, 100th Cong., lst Sess. pt. 1, at 17 (1987) (discussing OBRA 1987). Indeed, both Departments have represented to us that all FFB borrowers prepaying their FFB loans to date have prepaid using the proceeds of new loans obtained from private sources, and all such private loans have been guaranteed by the Administrator of REA using the existing guarantees.

[7] As the Agriculture Department notes, there were a number of reasons why Congress might have thought it necessary to include a directive to REA to provide guarantees to borrowers prepaying with refinancing proceeds Congress may have supplied the mandate out of a belief that it was unclear in the absence of such language that REA would even have had the authority to transfer such guarantees, *see* 7 U S C §§ 904, 936; *see also* Letter for Douglas W Kmiec, Assistant Attorney General, Office of Legal Counsel, from Christopher Hicks, General Counsel, Department of Argriculture at 10 and n 35 (Feb 9, 1989). Moreover, a mandate would have appeared necessary because both the Administration's objections to the prepayment program and OMB's proscription of blanket guarantees of private refinancings gave Congress no reason to expect that REA would exercise any statutory discretion to transfer existing guarantees. *See* OMB Circular A-70 at 8, ¶ 10(b)(4) (rev Aug. 24, 1984).

pay their FFB loans exclusively with refinancing proceeds. The prepositional phrase "with the existing loan guarantee" was included to effect only this intent.

This construction of the section is fully supported by the language of the statute itself. By its terms, subsection (a)(2) requires that "private capital" be used to replace the FFB loan. The term "capital" encompasses many kinds of private funds, including debt, equity, and internally generated funds. There is nothing in the subsection expressly limiting this otherwise broad term to refinance proceeds. Had Congress intended the phrase "with the existing loan guarantees" to require use of refinancing proceeds exclusively, we believe it almost certainly would have coupled this language with a term of limitation, such as "loan proceeds," rather than with the inclusive term "private capital."

We also find support for this interpretation in the fact that the phrase "with the existing loan guarantee" was set off by commas when section 306A was made a permanent part of the RE Act by OBRA 1986. Had Congress meant to limit the private capital that may be used to capital obtained by refinance, presumably it would have left the clause without commas, as it originally stood in the first prepayment provision in the 1986 Supplemental Appropriations Act. This amendment plainly strengthens the inference that Congress intended to give the term "private capital" its widest possible interpretation and not to limit it by a requirement that the capital be secured through refinancing.

In sum, we believe it is entirely natural to read the statutory phrase "with the existing loan guarantee" as meaning simply that, when a borrower chooses to rely on refinancing for all or part of the "private capital" used for prepayment, the borrower may secure that refinancing "with the existing loan guarantee."

This reading of subsection (a)(2) is supported by the legislative history. The Senate Appropriations Committee Report on the initial prepayment provision in the 1986 Supplemental Appropriation states:

> [B]orrowers [could] prepay any or all loans with the [FFB], by payment of the full amount of the unpaid principal balance on such loan advances.... REA borrowers may prepay these FFB loans only if they use private sector capital to make these prepayments. Existing REA guarantees on loans to be prepaid will also guarantee loans from private capital sources for like amounts used for these prepayments.

S. Rep. No. 301, 99th Cong., 2d Sess. 19 (1986). The language and structure of this passage strongly suggest that Congress intended the only condition to prepayment to be use of "private sector capital." Here, as in the statute itself, there is no suggestion that the only permissible form of private capital is loan proceeds. If Congress intended to impose the twin

122

requirements that private capital be used and that that capital be obtained through refinancing, it is only reasonable that it would have said so in the second sentence quoted above. The fact that the private capital requirement and the REA guarantee carry over are addressed in separate sentences, and as separate, unrelated thoughts, further suggests that the latter was not intended as a limitation on the former but rather as a separate mandate. Last, both the sequence and deliberate separation of the second and third sentences clearly suggest both that Congress regarded "loans from private capital sources" as but one of any number of forms of "private sector capital," and that these loans were the particular form of capital that must be eligible for REA guarantees.[8]

Finally, we believe that the Department of Agriculture's construction is consistent with Congress' overall design in enacting section 306A. Congress' express purposes were to improve the financial condition of cooperatives and to achieve savings for the cooperatives' customers. Requiring private refinancing as the only permissible form of prepayment would not appear to advance either of these goals. On the other hand, permitting a cooperative to use internally generated funds as part of its prepayment would effectuate the statute's purpose, yielding, in many cases, greater benefits of the kind sought by Congress.

We acknowledge that the Department of the Treasury's interpretation of subsection (a)(2) is by no means frivolous. On balance, however, we think it is less plausible. First, the Treasury Department has offered and we can discern no reason why Congress, given its broad remedial purposes, would have imposed a requirement that borrowers use refinancing as the exclusive means of prepayment. REA does not benefit financially or otherwise by guaranteeing such private sector loans; in fact, it is burdened to the extent of the contingent liabilities. *See* Letter for Benedict S. Cohen, Senior Counsel, Department of Justice, from Terence M. Brady, Deputy Assistant General Counsel, Department of Agriculture at 3 (Apr. 6, 1989). Nor does FFB benefit by any such requirement. More important, as noted above, such a limitation seems at odds with Congress' articulated objectives of strengthening the financial condition of cooperatives and passing benefits through to the cooperatives' customers, since prepayment through refinancing would obviously be more costly to borrowers.

Additionally, the Treasury's construction would produce anomalous results. Even under its interpretation, an FFB borrower that wanted to use internally generated funds to prepay its loan could do so. The bor-

[8] Section 637 of the FY 1989 Agriculture Appropriations Act does not purport to amend the existing language of section 306A(a) of the RE Act with which we are here concerned Both Departments, however, have directed us to the Conference Report accompanying the bill ultimately enacted as the FY 1989 Agriculture Appropriations Act, which contains language purporting to interpret that provision *See* H.R Conf. Rep No. 990, 100th Cong., 2d Sess. 38 (1988). As you have noted, such legislative statements subsequent to a statutory enactment cannot legitimately be relied upon in interpreting that prior enactment. *See generally Consumer Prod Safety Comm'n v GTE Sylvania, Inc*, 447 U S. 102, 117-18 & n.13 (1980).

123

rower would simply use its REA guarantee to borrow funds from a private lender, prepay its FFB loan, and then immediately prepay the new private sector loan with internally generated funds. And borrowers that are prosperous enough to prepay with internally generated capital would be required to take out unneeded loans, backed by unneeded REA guarantees, before being permitted to use their capital for prepayment.

We have considered the possibility that Congress might have intended to require refinancing as a form of "means test" for prepayment — that is, as a means of ensuring that only financially distressed borrowers were permitted to prepay. This supposition, however, seems untenable for at least two reasons. First, in the context of this very prepayment program, Congress has showed that, when it wished to target prepayment provisions to financially distressed borrowers, it did so explicitly. *See* 1986 Supplemental Appropriations Act, 100 Stat. at 713-14 (undesignated paragraph); section 1011 of OBRA 1986, 100 Stat. at 1875-76. It is thus unlikely Congress would have relied on such indirect if not ambiguous means to effectuate the same purpose it elsewhere was accomplishing explicitly in the same program. Second, the statute would be ineffectual as a means test. As noted above, a requirement that prepayment be made only by means of REA-guaranteed refinancings would not ensure that only distressed borrowers participated in the program. Prosperous borrowers could simply take out REA-guaranteed loans from private lenders to prepay the FFB and then use internally generated capital to prepay the private loan. *See* Draft 1989 REA Regulations at 10-11 (1989).

## III. THE REGULATORY PRIORITY

As noted above, as a result of several enactments modifying section 306A of the RE Act, *see supra*, Part I at 117-19, only $500 million in FFB loans may be prepaid pursuant to section 306A without the approval of the Secretary of the Treasury. By statute, $350 million of this prepayment authority is reserved for rural electric cooperatives, and $150 million for telephone cooperatives. *See* Section 637 of the FY 1989 Agriculture Appropriations Act, 102 Stat. at 2264. It is our understanding that the Secretary has determined to withhold his approval of any prepayments exceeding $500 million in aggregate.

Draft Department of Agriculture regulations currently before OMB would set aside for "Financially Distressed Borrowers"[9] $200 million of the $350 million statutorily allocated for electrical cooperatives, and would give processing priority to the applications of such borrowers. Section 1786.6(a). With respect to the remaining $150 million of the $350 million allocated for prepayments by electrical cooperatives and the $150 million allocated for prepayment by telephone cooperatives, the regula-

---

[9] *See supra* note 5

tions would give processing priority to the applications of borrowers who agree to prepay with "Internally Generated Funds," defined as "money belonging to the borrower other than: (1) proceeds of loans made or guaranteed under the RE Act or (2) funds on deposit in the cash construction trustee account." Sections 1786.6(a); 1786.3(a). The Department of Agriculture has predicted that prepayment applications by financially distressed borrowers and borrowers using internally generated cash will exceed in the aggregate the $500 million prepayment authorization not subject to the Treasury Secretary's approval. *See* Draft 1989 REA Regulations at 14-15. Because the Secretary has determined to disapprove applications exceeding $500 million in aggregate, the priorities established by REA could determine whether some borrowers are permitted to prepay.[10] You have asked us whether this priority is statutorily permissible. We believe that it is not.

The only borrower-specific requirement of section 306A(a)(2), as we conclude *supra*, is that prepayment be by use of "private capital." Congress expressed no preference in the statute or its legislative history for any particular means of prepayment; it did not prefer prepayment by internally generated funds over funds generated through means of REA-guaranteed refinancing, or vice versa.

In the face of statutory language equally permitting payment both by internally generated funds and by the proceeds of REA-guaranteed refinancings, and a mandate to REA to carry over upon request REA guarantees to refinancing loans from private lenders, we think that imposition of a preference disadvantaging those who choose to use REA guarantees would indeed be inconsistent with the statute. We find such a preference especially troubling where, as here, by operation of the preference it is possible that some distressed borrowers, who were among the principal beneficiaries of the prepayment program, might be precluded from prepayment, given REA's prediction that the $500 million available for prepayment without the approval of the Secretary of the Treasury will easily be exhausted. Draft 1989 REA Regulations at 14-15.

In the commentary section of the draft regulations, the Agriculture Department explains that the prepayment priority for Internally Generated Funds, inter alia, "encourages borrowers to privatize, reduces potential future impacts on the Revolving Fund, ... make[s] it possible for all borrowers who apply to make such a prepayment to participate in the program without significantly increasing administrative burden on REA[; and] [i]n addition ... ensures that [the] amount of existing prepayment authority not requiring the Secretary of the Treasury['s] approval will be

---

[10] In the commentary appended to the regulations REA has noted its intention that "[i]n the event that during the application period REA does not receive prepayment applications totaling $150 million from electric borrowers desiring to use Internally Generated Funds or $150 million from telephone borrowers desiring to use Internally Generated Funds REA intends to issued [sic] amended regulations establishing new priority criteria and a new application period." *See* Draft 1989 REA Regulations at 14-15

used in an economically efficient manner maximizing the benefits to all borrowers." Draft 1989 REA Regulations at 17-18.

In an additional submission to us, the Department of Agriculture has further argued that the priority is justified because it would have the following effects: lower costs to borrowers; faster prepayments; participation by a larger number of borrowers; reduced regulatory burdens for borrowers and an associated diminished risk to REA; strengthening of the Revolving Fund; and a reduction of the administrative burden upon REA. Memorandum for Benedict S. Cohen, Senior Counsel, Department of Justice, from Terence M. Brady, Deputy Assistant General Counsel, Department of Agriculture (Apr. 6, 1989). While all these administrative efficiencies of the prioritization may be laudable, we do not think that they are sufficient to sustain regulations incompatible with the statute and its purposes.

This is not to say that any regulatory prioritization of prepayment offers would be impermissible. It is doubtful, for example, that a prioritization based either upon date of filing or upon readiness to prepay would be inconsistent with the statute.[11] Either requirement would be neutral as to the borrowers eligible for prepayment and the means by which they would make prepayment. Nor, we think, would a reasonable accommodation of distressed borrowers, such as that evidenced by the $200 million set aside for distressed electrical cooperatives, be prohibited, given Congress' particular concern for borrowers in financial hardship. *See supra* text pp. 121. But any regulation that either distinguishes among borrowers based upon the particular means of prepayment, or that gives priority to non-distressed over distressed borrowers, except consistently with later enactments,[12] would likely be suspect given the congressional intent discussed above.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11] In 1987 Congress itself established a priority based upon the order in which applicants for prepayment were prepared to disburse funds to the Treasury. *See* Section 1401(b)(2) of OBRA 1987, 101 Stat at 1330-20.

[12] *See, e.g.*, Section 637 of the FY 1989 Agriculture Appropriations Act, 102 Stat at 2264 (reservation of funds for telephone borrowers).